Good morning, brothers. My name is Sean Simmons. I'm here on behalf of Appellant Fernando Arango. With me today is my colleague, Bryce Woolley, who is a third-year law student at UCLA, and he's participating in the appeal through the UCLA Appellate Advocacy Clinic. We have divided the argument amongst ourselves today so that I'll be responsible for the venue portion of the argument, and Mr. Woolley will take responsibility for the summary judgment portion of the argument. We'd like to reserve two minutes for rebuttal, and I'd like to take the first five minutes to talk about venue. The controlling statute here is 8 U.S.C. section 1451A, and that statute says that the government must generally institute a denaturalization proceeding in the judicial district where a defendant may reside at the time the proceeding is commenced. So the key question here is where did Mr. Arango reside at the time this proceeding was commenced? Our view is we said in the papers is that really ought to be the Central District of California. That's where he was eating and sleeping. That's where he hung his hat. That's where he received mail. That's where even the government sent him mail. Does he still own a house? No, he does not. Does he have family still in Arizona? No, he has no continuing ties to Arizona. So he left Arizona in May of 2007, and the case below was commenced in March of 2009. So he had no continuing ties to Arizona. When was the case? 2009? Yes. And where was he between 2007 and 2009? He was in San Pedro in the Central District. Are you asking that we send this back to the district court to determine venue, or are you asking us to tell the district court what the proper venue is? I think we would request that the court tell the district court what the proper venue is. And in your view, it's Central District of California. That's correct. Do we have the facts about the fact that he doesn't own a home in Arizona, he has no further ties to Arizona, and he was living in San Pedro? Is any of that in the record? That is in the record. He filed a motion to dismiss and attached to that motion. Where is it in the record? It is at page 157. This is a—is it S-E-R? E-R 157. E-R 157. Yes, through 158 is the declaration. So you don't think we need any further fact-finding? You think we have enough? Does the government contest those allegations as to where he lived at that time? I don't believe so, but we'll obviously— We'll ask her, but I mean— I don't believe there's any dispute. I think the dispute centers around how we ought to interpret and apply the residency requirement of 151A. I'm looking at his affidavit now, and that was very helpful. Thank you. If it's true that he was living in California since 2007 and severed all of his ties with Arizona, then we don't have to get into any questions about the residence of prisoners who have been involuntarily incarcerated in some place far from home as to whether that's their residence or not. Is that correct? I mean, this is just a straight-up civil procedure one question of where he was—you can even go to the domicile rule and say he was physically present in California with the intent to remain there, and until he changes his domicile by being physically present someplace else with the intent to remain, this is just a straight domicile rule, being an equivalent—make equivalent residence and domicile, and we're done. I think that's right, Your Honor, because that's what the record reflects. He was physically present, and that's where he intended to remain and considered himself a resident. Anything further, counsel? Nothing further, Your Honor. Okay. Thank you very much. I will let my colleague address the summary judgment. Absolutely. Thank you, Mr. Simmons. Thank you. May it please the Court, Bryce Woolley of the UCLA School of Law Ninth Circuit Appellate Advocacy Clinic supervised today by Sean Simmons on behalf of Appellant Fernando Arango. Arango lived in the United States for 30 years as a citizen for over a decade when the government took his citizenship away without a trial. While he was incarcerated 500 miles away and denied the meaningful opportunity to gather evidence in his defense. The evidence that Arango was able to produce showed that he had a cooperation agreement with the government that permitted him to lawfully remain in the United States despite his 1980 marriage to Vicki Tirado. And I gather you're pointing to simply this is a material issue of fact, and the district court can't decide that in the summary judgment. Is that right? That is correct, Your Honor. And that's also true with respect to the alleged misrepresentation and concealment of the circumstances of his marriage. That is correct, Your Honor. So it's a pretty straight up civil procedure issue. Yes, we believe it is. Okay. In this case, the district court necessarily made an impermissible factual determination, a factual dispute and a credibility determination when it dismissed Arango's evidence as mere good luck and instead credited the government's version of events. As you stated, the government has not met its burden here. Arango provided a detailed affidavit discussing the terms of his cooperation agreement and the circumstances of his naturalization. Arango also provided e-mails from his sister Valbuena discussing the creation and terms of the cooperation agreement. These e-mails are contained in the record at page 50 in the excerpts of record. Valbuena states, and I quote, They, the INS, told me that due to my cooperation and all the help in the case, they have given me a pardon and that I can stay in the country without any problems. After a few years, I asked him, Agent Hittleman, an INS agent involved in this case, that I wanted to become a U.S. citizen, and he told me that there was no problem for neither you, Arango, or me. It was sufficient enough what I did from the cooperation point of view. I don't want to interrupt your flow of thought here, but I think we're familiar with the allegations that were made by your client that are in the brief and so on, and it does appear these are material matters that go to the heart of both those claims, meaning the marriage and the alleged cooperation agreement. Aside from those, which admittedly seem to provide material issues of fact, do you have other items that you would like to add in your argument other than what is contained in your brief? There will be no additional arguments. We would just like to emphasize again that the government only challenged the genuineness of the factual dispute in this case, not even the materiality or the effect that the cooperation agreement would have. Would that make any difference? Doesn't that, again, take us back to the issue? If it's a material issue of fact that's determinative of the issue, you've got to send it back to the district court for a trial of fact. Yes. Is that correct? That is correct. It is essentially a straightforward question about that the government did not meet the standard under Rule 26 of the Federal Rule of Civil Procedure. Okay. In that, does the bench have any further questions regarding? We don't. I'm sure we're going to have a lot of questions for the government. Why don't you save your time for rebuttal? Yes, Your Honor. Thank you very much. Good job, by the way. May it please the Court, I'm Kirsten Dobler on behalf of the United States. The United States asks this Court to affirm the district court's order granting summary judgment and revoking Mr. Arango's naturalization. How can the government really ask that in this case? I mean, you've got two issues here. One, Mr. Arango says he had a cooperation agreement. The government says he doesn't. He says he does. That goes to the very heart of this whole matter, does it not? It does and that it's material, Your Honor. Absolutely, the government doesn't. So why would not that compel us to remand for a trial of the fact in this case rather than having it disposed of by summary judgment? Well, Your Honor, because some alleged factual dispute is not enough to overcome summary judgment. It must be a genuine issue of material fact. But that doesn't the genuineness go to the very heart of whether or not that's what a jury determines. That's what a finder of fact determines is whether in fact it is genuine. They weigh the credibility of the parties and make a determination of who's telling the truth. Your Honor, respectfully, a judge determines whether summary judgment is appropriate in the face of even conflicting evidence if a reasonable fact finder could not return it. If it's not material and it doesn't go to the heart, that's right. But otherwise, we don't let district judges decide material issues of fact. That's Civil Procedure 101. In this case, Your Honor, the district court did properly weigh the affidavits. Before, however, it didn't improperly weigh the evidence, as counsel has argued. Judge Burry made an objective and not a subjective determination. How can he do that in light of the exchange of e-mails between Mr. Arango and his sister? Well, Your Honor, those e-mails were directly refuted by Ms. Arango's sister. Oh, they weren't directly refuted. They were obliquely addressed. She came back and she said, well, I used the word perdón in the Spanish, which was translated as pardon, and I didn't mean that pardon in the technical sense of the sense that the Constitution uses that I was granted a pardon by the President of the United States. Well, great. That helps a little bit, but it sure doesn't get the government home. I don't think anybody was tempted to construe it in that way. Your Honor, what it does do is refute Mr. Arango's argument that there was undoubtedly an agreement in place between the United States Well, I have to say that the whole circumstances under which he was allowed to stay in the United States and become naturalized, and the fact that he was a Border Patrol agent, which requires an extensive background check and the government didn't come up with it, if the government's correct, then somebody at the Border Patrol is in really deep trouble for having run a very, very bad background check on Mr. Arango, aren't they? I certainly understand that concern, Your Honor. And I have to say that it just sort of smells. It just doesn't smell good. Well, as you've mentioned, Mr. Arango has stated that the time lapse between the date on which he naturalized and the date on which the government filed its denaturalization complaint may indicate that there was some agreement, as you seem to imply. However, even if the court construes that passage of time as an indication that Mr. Arango received criminal immunity, use immunity, or that he was permitted to remain here without being removed, there's no support in the law at all that that kind of use immunity can extend to permits. But you know something, counsel? You have just shifted ground. That may be a brilliant argument, but it's not the argument the district court relied on, and you have just made a major shift in ground, which is to say, even if the government had an agreement with Mr. Arango, it wouldn't matter. Well, I'm hard-pressed to find out, if the government had an arrangement with Mr. Arango, why it wouldn't be relevant to know what the arrangement was. Well, Your Honor, ultimately it wouldn't be relevant because there's no genuine issue of material fact that Mr. Arango is also subject to denaturalization because he willfully misrepresented and concealed the fact that his marriage was a sham throughout his naturalization. But again, you are treating these as being true when, in fact, they are merely allegations. He comes back and says, hey, they knew all about this. They even made me a border patrol agent. That couldn't possibly have occurred had there not been some kind of an agreement. Like Judge Bivey says, I mean, this flies in the face of, you know, any kind of rational conduct on the part of the government unless there was something there. And at the very least, this is not something for the district court to be deciding on summary judgment. This should go before a jury or the judge sitting as the trier of fact, if that's what the parties consent to, the defendant consents to. I find difficulty understanding how you can, with a straight face, say, you know, they say this, we say that, but the judge has decided it. That's not the way it works on summary judgment. But, Your Honor, this Court reviews summary judgment de novo, and at this point it doesn't matter. That's what we're doing. I understand. And even if there was some kind of agreement in place that allowed Mr. Arango to remain in the United States, as I mentioned, there's no support at all in the law that that can extend. You're switching again. That's a huge shift. If they had some kind of arrangement, at least I, and I won't speak for Judge Smith, but at least I am curious to know what the arrangement was with Mr. Arango. I think that the arrangement might have everything to do with the circumstances under which he was hired for the Border Patrol. Your Honor, there couldn't have been an arrangement that allowed Mr. Arango to naturalize, because the INA is a very, it has a very strict scheme that allows. It does, it does sound, it does sound a little suspicious. But to say it couldn't doesn't mean that somebody didn't violate some rules here. There's a novel in here somewhere. But, Your Honor, although the government may, in certain circumstances, bind itself, for instance, agreeing to not oppose a motion for relief from removal if an alien provides assistance to the government, the government can't circumvent these strict naturalization laws. It cannot go around the INA, which is extraordinarily strict. You're really making an estoppel argument now, and you're arguing that there's no estoppel against the government. That may well be true, but it's certainly something that we ought to look at. And although the Supreme Court has come very close to saying there absolutely is no estoppel against the government, in fact, the court has stopped short of using that word absolutely. So, yes, you have a very powerful argument based on the Supreme Court's history of dealing with estoppel arguments against the government, but you don't have the benefit of an absolute rule on that. And our court, at least, has said there may be some circumstances in which there is estoppel against the government. Let's switch subjects just for a minute, and that has to do with the venue argument. Judge Biby mentioned a minute ago that based upon the affidavit of the defendant here that he lived in San Pedro, I gather from 2009 or whatever it is, but bottom line, it's just a straightforward issue of where he resides. Do you agree that we don't need to get into the issue of whether where someone is held in a prison is the issue of residency in this case? No, Your Honor, because Mr. Arango didn't just move to California. Mr. Arango was incarcerated in California. In 2007? Mr. Arango was convicted in 2007, yes, and that was when he was incarcerated in California. Before that, his last known residence was in Arizona. And 8 U.S.C. section 1451 requires the United States to file a denaturalization suit in either the district in which the defendant currently resides or if the defendant doesn't have a current residence within any district in the United States. So you're saying he didn't move to San Pedro. He was moved to San Pedro because that's where Terminal Island is. Is that what you're saying? It's well established that residence involves some choice. I understand. What I'm trying to understand is whether he moved there beforehand and whether this is, in fact, something that the district court needs to determine as, again, a factual issue, whether he moved there, he has a house there, whatever, according to the affidavit, or whether he was moved there involuntarily as a prisoner. Well, Your Honor, in Mr. Arango's motion to dismiss for improper penalty, he acknowledges that he moved to California because of his conviction, I believe. Well, let me be clear on this. He moved because he knew he was going to be in prison? Or he was picked up, arrested, and taken there as a prisoner to San Pedro? I misstated that. My understanding is that Mr. Arango was picked up and taken to prison in California following his conviction for his cocaine trafficking. And he was picked up where, in Arizona? I believe so, Your Honor. If that's true and he's involuntarily in California, and even if he tells us, I intend to remain in California, even if you let me out tomorrow, I intend to stay here and not to return to Arizona, there are cases that suggest that the prisoner venue rule is not an absolute one. Sixth Circuit's case, in particular, is informative on this and explains a number of rules, a number of reasons why the fact that a prisoner is, we generally think that a prisoner's last home is the one that he went to before he went to prison, but that that rule should not be absolute. Now, we have not addressed that question expressly that I can see. Your Honor, 8 U.S.C. 1101, A33 defines residence in the INA, and that specifically excludes any intent on the part of the defendant. Yes, I have that in front of me. It says the place of general abode of a person means his principal actual dwelling place, in fact. Well, that would be Terminal Island, wouldn't it? Your Honor, no, because— Without regard to intent. Whether he's saying, I will never step foot in the state of California again, I hate it here. Your Honor, respectfully, residence necessarily involves some aspect of choice by the resident. Why? That's what the Third Circuit determined in Stabler and the Second Circuit determined in Neuberger. Those are very old cases. The more current thinking, I think, is that it's about a 1973 case by the Sixth Circuit that went through those cases actually pretty carefully. Your Honor, but as this Court determined in Cohen, citing both Gronage, which is an Eastern District of Washington case, as well as Neuberger, which is a Second Circuit case, a person doesn't become a resident of the state or the district in which he is incarcerated. What if somebody is in for life in some place and was previously a resident of, say, Thailand or something like that? If somebody wants to bring a civil suit against that person, are you saying that under the United States statute that you cited, they couldn't possibly sue him based upon where he is in prison? Your Honor, it's possible. Assuming that this incarcerated person never resided in the district in which he's currently incarcerated. Let's assume that for a moment. Okay. The United States could either then file a denaturalization lawsuit in the United States district in which he resided before he was incarcerated. But what if he didn't reside in the United States district before he was incarcerated? Was he in another country? In that case, the United States can file a suit in the district of D.C., and that's, again, out of 8 U.S.C. 1451. So in my example, the Thai citizen that's been incarcerated for 20 years in Terminal Island, you would sue in the District of Columbia? Yes, Your Honor, precisely. And that's pursuant to the express language of 8 U.S.C. Section 1451. Excuse me. But it's a more recent case, the Second Circuit case in 1996, Costello. And that court found that because a person in jail does not establish residence in prison, denaturalization proceedings are properly brought in the district where the confined person properly resided. And that's precisely the situation we have here. Before he was incarcerated, Mr. Arango's last known residence was in Arizona, and that's why the district court correctly concluded that Venue was proper in the District of Arizona. If we were to decide that the district court improperly granted summary judgment and we had some questions in our mind about where Venue was, would you prefer that we send this back to the District Court of Arizona for hearings on the question of Venue? Yes, Your Honor. It would make sense to permit the District of Arizona to determine whether Venue was proper with guidance from this court, as opposed to directly transferring it to a district in California, yes. And I'd just like to mention that that not only comports with the language of Section 1451, but it also does constrain the government to filing a suit in a venue in which the defendant to a denaturalization proceeding at one point chose to reside. The government can't just transfer somebody to New Jersey and sue that person in New Jersey. And that's a very good point. It's one that is raised in the cases that we do have the problem. The government has control over the prisoner and could decide tomorrow that Mr. Arango should no longer stay in Terminal Island and should go someplace else, and that would certainly inconvenience him. Yes, Your Honor. Okay. Your Honor, briefly, obviously I'm running out of time, but I'd just like to reiterate that there's also no genuine issue of material fact that Mr. Arango also procured his naturalization by willfully misrepresenting and concealing a material fact, that is, that his marriage was a sham. Whether or not Mr. Arango disclosed that. That one, too, is disputed. He probably should have disclosed it on his form, but there's at least a conversation he had with the agent that he thought that it was in his A-file, and it's hard to think why it wasn't in his A-file. But even if, Your Honor, the agent who conducted Mr. Arango's interview knew or had that document in her file, which she denies knowing about that sham marriage, so it's highly unlikely that she did. She didn't really remember him. She didn't remember him, Your Honor, that's correct, but she distinctly states that if she had been informed about his sham marriage, that she absolutely would not have approved his naturalization application on that date. But you still have the fact that he ended up as a Border Patrol agent. Yes. And it at the very least raises all the hackles, you know, why would that possibly be unless there was something more to this than meets the eye? But, Your Honor, that doesn't excuse the fact that Mr. Arango tried to pass his marriage off as a legitimate one on his immigration forms. Not once but twice, when he first signed the forms and filed them, and again when he reviewed the forms, signed them under penalty of perjury, affirming that the contents were true and correct. And as we know, that is far from the truth. I see that I'm out of time. May I briefly conclude? Certainly. In conclusion, no reasonable fact finder could have determined that Mr. Arango would have been entitled to a verdict in his favor, notwithstanding Mr. Arango's affidavits. Moreover, the District Court properly exercised its discretion in denying Mr. Arango's Rule 56-F motion and correctly determined that venue was proper in the District of Arizona. As a result, the United States asks this Court to affirm summary judgment revoking Mr. Arango's naturalization. Thank you. Thank you, Ms. Talbert. Mr. Simmons, the question I'd like to start with is one on a question I asked you before. When Mr. – I'd understood you to say that Mr. Arango moved to California in 2007. He didn't exactly move there, did he? No. He was moved. That's right, Your Honor. Okay. I feel a little misled on that one. I apologize. I didn't appreciate the nuance, but I thought what Your Honor was getting at there was domiciles attested of physical presence plus intent. And he had both, and we didn't make the domicile argument. But you certainly, at the very least, left the clear impression that he had voluntarily moved to San Pedro. You didn't at all make it clear that he was moved there. Then I apologize, and I actually came back up here as opposed to Mr. Woolley because I thought it was important that I clarify that. And also make clear on the record that we're not contesting that he moved to San Pedro. Okay. Or that he was moved to San Pedro. That then changes the question that I asked you, or at least the answer to the question I previously asked you. Now that does invoke all of the questions of venue over incarcerated prisoners, doesn't it? Well, I guess what I understood Your Honor to say was something craftier than I had thought when drafting the argument. No, I'm not that smart. Well, if it does invoke all of the residence issues, then I really do think we still win there. Because there's this focus in some of the cases on voluntariness. And I don't know why when interpreting this word in the statute there's this focus in those cases on voluntariness. It seems to me that this is about convenience of the forum. And if it's about convenience of the forum, what really matters is presence. But that's really a separate issue, is it not? The statute refers to residence. And it doesn't talk about voluntary or involuntary. But the reality is the government can move people around wherever. I mean, the issue of whether it's a convenient forum is something the district court can determine based upon where the witnesses are. But the government regularly holds trials in, say, New Jersey, where you have California residents involved. And they say, that's tough. You know, is this the way it's going to be? We're going to handle it that way. And it seems to me, in light of your changed representation here, that we have to deal full bore with this issue of what the statute means in connection with a prisoner who was put in a prison against his or her will. Why isn't the government correct, then, that under the statute, I guess 1451, why isn't Arizona an appropriate venue? So Arizona is not an appropriate venue because he, in fact, resides. And he resided at the time. Well, he involuntarily resides here now. But before that, he chose to live in Arizona, did he not? That's correct, Your Honor. How is he prejudiced, particularly in light of many of the things that are alleged here, allegedly occurred in Arizona and people who theoretically would know about it would be in Arizona? Well, the crime for which he was incarcerated took place in Arizona. Right. That would come under the criminal venue rules, not the naturalization venue rules. And to obtain residency, he was in Manhattan, New York. He naturalized in Florida. So Arizona doesn't actually have any connection to the circumstances surrounding his naturalization. So your argument is that wherever somebody is incarcerated, that's where they live. Is that a blanket rule from your perspective? I don't think the court has to go that far. I think in stature, the court said residence means actual abode, actual dwelling place. And there are a lot of factors that can bear on that. And if you look at those factors here. But that didn't deal with the prison context, did it? No, it did not. It dealt with the non-prison context. But I don't see why the rule has to be different for a prisoner versus a non-prisoner, that there has to be a blanket rule. But it's very different, is it not? I mean, all of the traditional domicile and residence issues deal with where people choose to live or where they intend to return. This is an entirely different context where somebody is incarcerated and the government and the Bureau of Prisons can move them around at will. Why should we follow your approach on this? Why doesn't 1451 permit other contexts, such as Arizona? I think because it results in cases like the one here, which is a defendant who no longer has contacts to Arizona, has been out of Arizona for two years. Another defendant might be out of Arizona for 15 years. And then they go back and we litigate the case in Arizona, which is 500 miles away. I think that makes it harder on an incarcerated defendant to try and obtain pro bono counsel. It certainly makes it harder for the incarcerated defendant to communicate with his family. You agree that we should send this issue with instruction back to the district court in Arizona to make a determination about the venue in this case? You know, I still think the record actually is clear and full enough on this to decide it here. Because we don't dispute the issue of his residence change when he was incarcerated. But it's clear in the record that he had no continuing ties to Arizona. So I do believe it's – Well, I'm not sure the government would agree with you about that. It is a disputed matter, is it not? I think what we have is a legal dispute about how – But the legal dispute – the predicate to the legal dispute is a factual dispute. Is it not? Maybe the government should make their case on this, too. But I don't think there actually is much of a factual dispute. Maybe not. But to the degree there is a factual dispute, we're not really the body to decide that, are we? That's correct. If there is a factual dispute, then it would need to go down to the district court. So I gather you don't have any great objection if we send it back to the district court in Arizona to make a determination with guidance as to where the proper venue resides. If there's still a determination that there's some fact that's still in dispute that warrants that, then the answer is we wouldn't have any objection to that. Is the question of venue over incarcerated prisoners – has that ever been addressed by our court squarely? Even in very old cases? So the one case we have is Cohen, which the government cites in their paper. And there's language in Cohen that admittedly we wish wasn't there. But I don't think Cohen is controlling on this issue at all because it was a tax case, not an immigration case. It involved a statute with different language. Why would that make any difference? Because I think the question is whether it controls here. If the question is whether can Cohen be extended to also govern this circumstance, then I think the court can choose to extend it. But I don't think the court is bound to extend it. So you think the question is still open? I do, yes, Your Honor. And you would prefer that we adopt something like the Sixth Circuit's decision in Stifle v. Hopkins? And also something – or just follow the United States v. Stature case and adopt just a balanced test to determining residency that isn't so focused on voluntariness, which frankly it just seems like too fine a parsing of the word. And on that note, I would just say this is about venue and convenience of the forum. So if we want to construe resigned in relationship to convenience of the forum, I think voluntariness is the wrong thing to focus on, and actually physical presence and where it's going to make sense to actually litigate the dispute is more sensible to focus on. How long is Mr. Rango's sentence? He had nine years, I believe. Which he began in 2007? That's correct. Anything further, Mr. Simmons? That's when he moved to San Pedro, right? No, that's right. I apologize again for that. I wasn't trying to be sneaky. I thought someone was just a lot smarter than I was. Be real careful next time, okay? Yes, Your Honor. Okay. Thank you, and we thank the UCLA Clinic for its excellent representation in this matter and its assistance to the court. Thank you very much to both of you, counsel and Mr. Bulley as a student. We thank the government as well for its argument on this case, and Rango is ordered to submit it on the briefs. The last case on the oral argument calendar is Avila v. Walker.
judges: Wardlaw, Bybee, Smith M.